UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEOPOLDO TENORIO JIMENEZ,
ISRAEL TENORIO, and HERMELINDA
LEYVA DE TENORIO,

       Plaintiffs,

v.

                                 File No.  1:06-CV-456

LAKESIDE PIC-N-PAC, L.L.C., JEFFREY         HON. ROBERT HOLMES BELL
A. GROENHOF, GEORGE FRITZ, SR., and
FIDEL TRINIDAD LOPEZ,

       Defendants.

_____/

# **O P I N I O N**

In this action three seasonal farm workers allege violations of the Migrant and

Seasonal Agricultural Worker Protection Act ("AWPA"), 29 U.S.C. §§ 1801-1872, and the

Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219. This matter is currently before

the Court on Plaintiffs' motion for certification of collective action, for tolling of the statute

of limitations, for disclosure of names and addresses of potential opt-in plaintiffs, and for

court-ordered notice to potential opt-in plaintiffs (Dkt. No. 34), and on Plaintiffs' motion for

class certification (Dkt. No. 36). For the reasons that follow the motions will be denied.

## I.

Plaintiffs Leopoldo Tenorio Jimenez, Israel Tenorio and Hermelinda Leyva de

Tenorio are seasonal farm workers who were employed by Defendants Pic-N-Pac L.L.C.

("Lakeside") and Brookside Farms ("Brookside") to harvest blueberries.  (Dkt. No. 13, Am. Compl. ¶¶ 14, 41, 43.)  Lakeside is a Michigan corporation whose principal place of business is located in Ottawa County, Michigan.  (Dkt. No. 15, Lakeside Answer ¶ 4.) Defendant Jeffrey A. Groenhof is one of the owners of Lakeside.  (*Id.* ¶ 6.)  Lakeside is the business of buying, harvesting, packing, and selling blueberries.  (Jeff Groenhof Dep. 9.) Defendant George Fritz, Sr., is a partner in Brookside.  (G. Fritz Dep. 3.)  Brookside owns blueberry fields near Gobles, Michigan and also buys blueberries on the bush from 25-30 growers.  (G. Fritz Dep. 6-7.)  Defendant Fidel Trinidad Lopez is a farm labor contractor who worked as a crew leader at both Lakeside and Brookside.  (Jeff Groenhof Dep. 10; G. Fritz Dep. 8.)

Plaintiffs allege in Count I that Defendants violated the AWPA by violating the terms of the working arrangement; failing to pay wages owed when due; failing to make, keep and preserve payroll records; failing to provide itemized pay statements; and failing to abide by the AWPA posting requirements.  (Dkt. No. 13, Am. Compl. ¶ 44.)  Plaintiffs allege in Count II that Defendants violated the FLSA by failing to pay the Plaintiffs the minimum wage for all hours worked.  (Am. Compl. ¶ 53.)  Plaintiffs seek to bring this action on behalf of not only themselves, but also on behalf of others who were similarly situated, i.e., those who worked for Defendants from June 29, 2000, to June 29, 2006, who were subject to the same violations of the AWPA and the FLSA.  Because the FLSA contains its own collective action provision, Plaintiffs seek collective action certification under the FLSA for their

FLSA claim, and class action certification for their AWPA claim.  The Court will address the FLSA claim first.

## II.

In Count II Plaintiffs allege that Defendants violated the FLSA by failing to pay Plaintiffs the minimum wage for all hours worked as required by 29 U.S.C. § 206.  (Am. Compl. ¶ 53.)  Plaintiffs allege that they are victims of "a uniform and company wide compensation policy" which operates to compensate them at a rate less than the then effective federally mandated minimum wage of $5.15 per hour.  (Am. Compl. ¶¶ 52, 53, 55.) Plaintiffs allege that Defendants' violations of the FLSA resulted in part from Defendants' "failure to supplement the piece-rate earnings of the Plaintiffs so as to raise their individual pay period wages to a rate equal to or exceeding the minimum wage."  (Am. Compl. ¶ 54.) Plaintiffs have requested the Court to certify the FLSA claims as a collective action in accordance with 29 U.S.C. § 216(b) and to authorize notice to be sent to potential opt-in plaintiffs.

The FLSA authorizes one or more employees to pursue an action for violations of the FLSA's minimum wage provision in a representative capacity for other employees who are "similarly situated."   29 U.S.C. § 216(b).  Each individual "class member" in an FLSA collective action must "opt-in" to the suit by filing a consent in writing to become a member of the suit.  *Id.*  The Court has discretion to facilitate notice to potential class members. *Hoffman-La Roche Inc. v. Sperling*,  493 U.S. 165, 169-70 (1989).  Plaintiffs bear the

burden of showing that they are "similarly situated" to the putative class members.  *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096  (11th Cir. 1996).  To meet this burden, Plaintiffs need only show that their positions are similar, not identical, to the positions held by the putative class members.  *Id.*

The Sixth Circuit has not addressed the procedure for certifying a collective action under the FLSA.  However, a number of courts have approved a two-stage approach of "conditionally certifying" a class for notice purposes early on in the case, followed by a final determination of "similarly situated" based upon a more rigorous review after discovery is complete.  *See Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1105 (10th Cir. 2001); *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1217-19 (11th Cir. 2001); *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213-14 (5th Cir. 1995).  Factors relevant to the first-stage conditional certification include whether potential plaintiffs have been identified, whether affidavits of potential plaintiffs have been submitted, whether there is evidence of a widespread discriminatory plan, and whether, as a matter of sound case management, a manageable class exists.  *Olivo v. GMAC Mortg. Corp.*  374 F. Supp. 2d 545, 548 (E.D. Mich. 2004).

When the conditional certification is made early on in the suit before discovery has been undertaken, the determination is made using a fairly lenient standard based "only on the pleadings and any affidavits which have been submitted."  *Mooney*, 54 F.3d at 1213-14.  However, where the parties have had an opportunity to conduct pre-certification discovery,

courts tend to hold plaintiffs to a higher standard of proof. *See*, *e.g.*, *Guerrero v. Brickman Group, LLC*, Case No. 1:05-CV-357, slip op. at 7 (W.D. Mich. Mar. 26, 2007) (Cleland, J.) (declining to conditionally certify a collective action where the plaintiffs did not make even a modest factual showing to rebut the defendants' substantial evidence that the plaintiffs were not similarly situated); *Olivo*, 374 F. Supp. 2d at 548 (requiring "modest" factual support for class allegations where discovery had been allowed on the issue of collective action certification); *Thiessen v. Gen. Elec. Capital Corp.*, 996 F. Supp. 1071, 1081 (D. Kan. 1998) (adopting an "intermediate" approach in analyzing the "similarly situated" issue where the parties had engaged in three months of discovery).

The parties have had six months to engage in pre-certification discovery. (Dkt. No. 24, Case Mngm't Order). Accordingly, in determining whether Plaintiffs have met their burden of showing that they are "similarly situated" to the putative class members, the Court will review Plaintiffs' allegations and affidavits in conjunction with the evidence gleaned through discovery. It is not the role of the Court at this stage of the proceedings to decide the case on the merits. *White v. MPW Indus. Servs., Inc.*, 236 F.R.D. 363, 368 (E.D. Tenn. 2006). Nevertheless, the Court has "a responsibility to assure that there is some factual basis for plaintiffs' claims of class-wide discrimination before judicial approval of the sending of notice is granted." *Severtson v. Phillips Beverage Co.*, 137 F.R.D. 264, 267 (D. Minn. 1991).

Plaintiffs contend that they are similarly situated to other employees who worked for Defendants as hand harvesters from June 2000 to June 2006 because they have been employed in the same or similar positions, were subject to the same or similar unlawful practices, and their claims are based on the same legal theory.  (Am. Compl. ¶ 31.)

Although there were variations from year to year and from farm to farm, there is no significant dispute regarding the basic mechanics of how the hand harvesters were paid by Defendants during the relevant time period.[1]  Hand harvesters were paid on a piece rate basis, either by the bucket or by the pound.  The rate at which they were paid (price per bucket or price per pound) was determined by Defendants.  The rate varied during the season and sometimes from field to field based upon the quantity of berries on a bush. When there are fewer berries on a bush, it takes longer to pick, so the price per pound is increased in order to enable the workers to make a minimum wage.  (Dkt. No.  40, Ex. A, B. Fritz Dep. 26-27, 29-31;Lopez Dep. 22-23, 42, 45-46; G. Fritz Dep. 13, 32.)

Hand harvesters who worked for Defendants during the relevant time period did not have a pre-set work schedule.  They were free to work as many weeks during the season and as many days per week as they wished.  They were free to start work, end work and take breaks whenever they wished, except that they would not be able to pick when the fields were wet.  (Lopez Dep. 33-36, 39-40, 109; G. Fritz Dep. 17; Jeff Groenhof Dep. 37-38; L.

---

[1]Although the relevant time period for purposes of the complaint is 2000 to 2006, Defendant Lakeside was not in business until 2004, so the relevant time period for Defendant Lakeside is 2004 to 2006.

Tenorio Dep. 178; H. Tenorio Dep. 260; Dkt. No. 40, Ex. DD.)  There was no system for clocking in or clocking out for start times, end times, or break times.  The Defendants each had several crew leaders who supervised the hand harvesters. (G. Fritz Dep. 9; Jeff Groenhof Dep. 10).  Each crew had between 50 and 90 workers, but the number varied day to day.  (G. Fritz Dep. 20; Jeff Groenhof 37.)

Prior to 2004 Brookside relied on its crew leaders to record the number of hours worked by the hand harvesters.  (G. Fritz Dep. 17.)  Lopez testified that he did not keep track of the precise time when workers arrived at the field, when they started picking blueberries, when they left to eat, when they came back from eating, or when they left for the day.  (Lopez Dep. 40-41.)

From 2004 on, at both Brookside and Lakeside, each worker had a bar-coded badge. (G. Fritz Dep. 31; B. Fritz Dep. 19.)  Workers swiped their badges when they brought berries in to be weighed and their worker number, the time, and the quantity of berries would be automatically entered into a computer. (Joy Groenhof Dep. 16, 17, 28.)  Lakeside used the difference between the time of workers' first and last swipe to determine the approximate number of hours they worked.  (Joy Groenhof Dep. 29.)  Brookside would add an hour to account for the time spent picking berries before the first swipe.  (B. Fritz Dep. 31.)

Workers were paid weekly based upon the quantity of blueberries they picked. Although they were paid at a piece rate, Defendants would compare the quantity an

individual picked against the approximate number of hours the individual worked to determine whether the individual was making a minimum wage. (B. Fritz Dep. 30-31; Joy Groenhof Dep. 28.) Most workers would pick at a rate that would enable them to earn more than minimum wage. (Jeff Groenhof Dep. 35-36; Joy Groenhof Dep. 44.) Some made as much as $10 to $15 per hour. (G. Fritz Dep. 34; Jeff Groenhof Dep. 35.) If a worker did not pick the minimum necessary to make minimum wage, Brookside made up the difference with a wage adjustment. (B. Fritz Dep. 29-30.) At Lakeside, the computer indicated when a worker was "short." That did not happen very often, but when it did, Joy Groenhof would run a picker detail report which showed the start and stop time and the number of fields the worker was in that day. She would then subtract a half hour for lunch, a half hour for supper, and an hour for each field change. (Joy Groenhof Dep. 31-37, 44.) The picker detail report was also given to the worker and the worker was instructed to fill out the hours they worked each day. (Dkt. No. 40, Ex. EE.) If, on recalculation, the worker's hours still indicated that they were short, they would be paid more to get to minimum wage. (Joy Groenhof Dep. 48.)

Plaintiffs have presented evidence that Defendants recorded more than one worker's pounds on the same employee badge and that multiple employees were paid on a single check. According to Plaintiffs, Lopez told them that one check was enough for the entire family. (L. Tenorio Aff. ¶¶ 9, 15; H. Tenorio Aff. ¶¶ 9, 16; I. Tenorio Aff. ¶ 8; L. Tenorio Dep. 74; H. Tenorio Dep. 106, 171; I. Tenorio Dep. 76). Plaintiffs have presented evidence

that in 2003 Lopez listed the same start time and end time for all workers even though the workers did not necessarily work the same hours.  (Pl. Reply Br., Ex. 14.)  Plaintiffs have presented evidence that when Leopoldo Tenorio's net pay for five consecutive weeks in July and August 2003 is divided by the number of hours of work documented on the pay stub, the result reflects consistent earnings of $5.18 per hour for five consecutive weeks.  (Pl. Reply Br.,  Ex. 8.)  Plaintiffs contend that Lopez required them to show up at 7:00 a.m., but that they were not paid for the hours they spent waiting for the fields to dry.  (L. Tenorio Aff. ¶ 17; H. Tenorio Aff. ¶ 16; L. Tenorio Dep. 112.)

Based upon this evidence, Plaintiffs assert that Defendants were "cooking the books," and that Defendants systematically altered, manipulated, and failed to properly record the hours worked in furtherance of "an overall company policy and procedure at both farms designed to deny Plaintiffs their right to make minimum wage and create a misleading paper trail."  (Dkt. No.  46, Pl. Reply Br. 2-3, 4 n.8.)

As previously noted, one factor relevant to certification is whether potential plaintiffs have been identified.  *Olivo*, 374 F. Supp. 2d at 548.   Although employment records may be used to identify most of the potential plaintiffs, Plaintiffs have not suggested how unnamed individuals who picked on another individual's badge will be identified.  Another relevant factor is whether affidavits of potential plaintiffs have been submitted.  *Id.* Although Plaintiffs have had six months of discovery and published an article in a Spanish language newspaper inviting potential plaintiffs to contact Plaintiffs' attorneys for more

information about the suit, to date Plaintiffs have obtained a consent to opt-in and an affidavit from only one potential plaintiff.  (Dkt. No. 17, Pls.' First Consent to Join; Dkt. No. 40, Ex. Y; Pl. Reply Br., Ex. 1, Aff. of Abel Tenorio Zavala.)

Two other factors relevant to certification include whether there is evidence of a widespread discriminatory plan, and whether a manageable class exists.  *Olivo*, 374 F. Supp. 2d at 548.  The Court concludes that based upon the evidence submitted, neither of these factors has been met.  Although Plaintiffs have presented evidence of a uniform policy of not precisely recording their hours, they have not come forward with any authority to suggest that this failure, in and of itself, violated the FLSA.  They have not come forward with evidence to suggest  that the failure to keep more precise records of the hours worked necessarily resulted in payment of wages below minimum wage.  Neither have they come forward with evidence that Defendants intended to pay the workers at less than minimum wage.  There simply is no evidence to support the existence of a uniform policy that operated to compensate them at a rate less than minimum wage.

The best Plaintiffs have shown is that the system employed by Defendants was capable of resulting in wages below a minimum wage and that it might have resulted in wages below minimum wage on occasion.  However, whether a worker was paid a minimum wage depends on multiple factors unique to each individual on any particular day, such as the start time, break times, end time, rate of picking, rate of pay per pound, method of recording hours, whether an adjustment was made to the recorded hours, whether the worker

agreed to the adjustment of hours, and, if so, whether that agreement was coerced. Representations allegedly made by crew leaders raise additional issues.  For example, if a particular crew leader required a worker to report at a time certain, or required multiple workers to work under one badge, those requirements would contravene the written policy and would not necessarily be uniform among the various crew leaders.  Finally, the need to wait for a field to dry would impact workers differently depending on whether they lived in migrant housing at the field, or whether they commuted from a distance, as was the case for Plaintiffs.

Plaintiffs have not come forward with evidence of widespread abuses of the minimum wage requirements by these Defendants.  Moreover, because of the hypothetical nature of the alleged FLSA minimum wage violations the Court would have to sort through evidence individual by individual, and paycheck by paycheck.  In light of the large number of factual determinations that would be necessary to a finding that any one individual was paid less than minimum wage on any one day, this case would not be manageable as a collective action.  Accordingly, the Court denies Plaintiffs' motion for certification of their FLSA claim as a collective action under 29 U.S.C. § 216(b).

## III.

In Count I of their complaint Plaintiffs allege that Defendants violated the AWPA by violating the terms of the working arrangement; failing to pay wages owed when due; failing

to make, keep, and preserve payroll records; failing to provide itemized pay statements; and failing to abide by the AWPA posting requirements. (Am Compl. ¶ 44.)

Plaintiffs seek to maintain the AWPA claims set forth in Count I as a class action. An action may be maintained as a class action only if the following prerequisites are met:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Although a district court has "broad discretion in deciding whether to certify a class," *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996), "a district court may not certify any class without 'rigorous analysis' of the requirements of Rule 23." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (en banc) (quoting *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982)). "The party seeking the class certification bears the burden of proof." *In re Am. Med. Sys.*, 75 F.3d at 1079.

## A. Numerosity

Numerosity exists where "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). A plaintiff need not prove the number of class members to a certainty. *Appoloni v. United States*, 218 F.R.D. 556, 561 (W.D. Mich. 2003)

(Quist, J.).  Courts have generally presumed that the numerosity requirement is met when the class has more than forty members.  *Id.*

Plaintiffs estimate the class size at 1000 members over the six year period at the two farms.  (Am. Compl ¶ 13.)  This estimate is supported by the evidence of record.  George Fritz testified that Brookside alone had about 250 hand harvesters in 2000,  350 to 400 by 2004, and 400 by 2006. (G. Fritz Dep. 39.)   In response to Defendants' contention that the numerosity requirement must be met as to subclasses for each employer, each season, and each crew, Plaintiffs point to evidence that each crew had more than 40 workers.  (G. Fritz Dep. 20; Jeff Groenhof 37.)  The Court is satisfied that the numerosity requirement has been met.

## B.  Commonality

The  second  requirement  of  Rule  23(a)  is  that  there  be  "questions  of  law  or  fact common to the class."  Fed. R. Civ. P. 23(a)(2). This does not mean that the claims of the potential class members must be factually identical.  *Senter v. Gen.  Motors Corp*., 532 F.2d 511, 524 (6th Cir. 1976).  The test for commonality is "qualitative rather than quantitative," such that a single issue common to all class members may be sufficient.   *In re Am. Med. Sys*., 75 F.3d at 1080 (internal quotation marks omitted).  For purposes of the commonality requirement a court must look for "a common issue the resolution of which will advance the litigation."  *Sprague*, 133 F.3d at 397.  The commonality requirement is generally met where the defendant has engaged in "standardized conduct towards members of the proposed

class." *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998). *See*, *e.g.*, *Putnam v. Davies*, 169 F.R.D. 89, 93 (S.D. Ohio 1996) (holding that commonality requirement is satisfied "as long as the members of the class have allegedly been affected by a general policy of the Defendant and the general policy is the focus of the litigation.").

Plaintiffs' AWPA claim can be loosely divided into three topic areas:  1) pay practices (paying all wages owed, maintaining accurate payroll records, and providing accurate wage statements); 2) posting requirements; and 3) field sanitation practices (toilets, handwashing, facilities, drinking water, and drinking cups).  Plaintiffs contend that commonality is present because the class members had the same job requirements, were paid according to the same pay provisions, and worked under the same conditions.

1.  Pay Practices

Plaintiffs contend that Defendants had no system in place for keeping accurate records of the hours worked by each picker.  Plaintiffs contend that although there were differences between the Defendants, the hours worked, the fields and the crew leaders, the differences were not material, and the workers shared common experiences based on Defendants' conduct toward the group as a whole.  According to Plaintiffs, the legal and factual issues relate to defendants' unlawful employment practices and procedures and not to the individual characteristics of the proposed class members who were treated as a homogenous group.

The standardized conduct Plaintiffs rely on in support of their wage and records claim is Defendants' failure to keep precise time records. This failure, however, is largely acknowledged by Defendants. Resolution of this issue will not advance the litigation. Plaintiffs do not claim that Defendants failed to keep adequate records of the amount of blueberries they picked. They only complain about the lack of records as to the hours they worked. As noted in the FLSA discussion in Section II above, Defendants' failure to keep precise time records for individuals who were paid on a piece rate basis is not sufficient to suggest a common practice of paying potential class members less than minimum wage.

Plaintiffs also contend that Defendants engaged in a practice of paying more than one worker on a single paycheck. Plaintiffs' testimony indicates that they only have evidence for the one crew on which they worked in 2003. (L. Tenorio Dep. 178, 183-85.) Although Leopoldo Tenorio claims that families were paid on one check in 2004, he acknowledged that he was not present on pay day to see how many checks were distributed to the family members. (L. Tenorio Dep. 235). Plaintiffs simply have presented no evidence that paying multiple individuals on a single paycheck was a widespread practice, or that it happened in years other than 2003, or under other crew leaders.

In *Sprague* the Sixth Circuit reversed the district court's class certification of early retirees from General Motors ("GM") after finding that the class did not meet the commonality and typicality requirements. 133 F.3d at 398-99. The district court had permitted the class to proceed on a bilateral contract theory and an estoppel theory. *Id*. at

15

398. In finding commonality lacking, the Sixth Circuit noted that the premise of the bilateral contract theory was that GM had made individual side deals with each early retiree. *Id.* Those putative side deals were based on a variety of oral and written representations that differed as to each individual. *Id.* The court concluded that commonality was lacking because proof that GM had conferred "vested benefits on one early retiree would not necessarily prove that GM had made such a contract with a different early retiree." *Id.* *Accord Saur v. Snappy Apple Farms, Inc*., 203 F.R.D. 281, 287 (W.D. Mich. 2001) (Enslen, J.) ("[W]here the nature of the legal claims are such that individuals would have to submit separate proofs to establish liability, class actions are disapproved due to lack of commonality.").

The same problems preclude a finding of commonality on the wage issue in this case. As noted in the FLSA discussion in Section II above, whether or not a particular class member received minimum wage would require the Court to undertake an individual inquiry into each worker's activities on each day. The individualized determinations necessary to a ascertain whether there has been a minimum wage violation far outweigh the common issue of failure to keep precise time records. Whether or not Defendants paid a minimum wage does not present a question of law or fact that is common to the proposed class.

2.  Posting of Notices

Plaintiffs allege in their complaint that Defendants failed to post notices required under the FLSA and the AWPA.  (Am. Compl. ¶ 27).  Leopoldo Tenorio stated in his

affidavit:  "I never saw a poster or notice explaining my rights as a farmworker or that indicated what the hourly minimum wage was."  (L. Tenorio ¶ 12.)  However, at his deposition he acknowledged that he saw a poster at the office.  (L. Tenorio Dep. 102-03, 222).

Defendants have come forward with evidence that they were aware of the posting requirements and that they did in fact post notices in various places at various times.  George Fritz testified that Brookside posted notices in the office, in the packing house, where they signed people up, and on the back end of the trucks driven by the crew leaders.  (G. Fritz 29; B. Fritz Dep. 53-54; Dkt. No. 40, Ex. II.)  Jeff Groenhof testified that Lakeside posted notices in the office, on posters staked in the ground, and on the backs of trucks.  (Jeff Groenhof Dep. 42-43; Dkt. No. 40, Ex. LL.)  Lopez testified that they placed the posters where they could be seen, on the trucks, on boards leaning against the trucks, or on the sides of the portable bathrooms.   (Lopez Dep.86-89.)

In light of the undisputed evidence that the notices were posted, Plaintiffs have narrowed their argument to assert that Defendants failed to post the notices in a conspicuous place.   Plaintiffs argue that because they worked in the fields, the issue must focus on whether the notices were posted in conspicuous places in the fields.  Because the evidence is undisputed that the notices were in the fields some of the time, the sufficiency of the posting will likely vary depending on the year, the day, the field, the crew leader, and the

individual.  Because the issue is not a standardized failure to post notices, but rather the sufficiency of notices on any given day, this issue lacks commonality.

3.  Field Sanitation Practices

Plaintiffs allege that Defendants violated the working arrangement by failing to provide toilet and handwashing facilities, failing to provide potable drinking water, and failing to provide single-use drinking cups.  (Am. Compl. ¶¶ 24-26.)

Brookside owned 6 or 7 trailer units with two toilets and a hand wash facility in between.  In addition, Brookside leased some portable toilets and some of the fields had toilets owned by the growers.  (G. Fritz Dep. 21-22; Lopez Dep. 73-74; Dkt. No. 40, Ex. W; Jeff Groenhof Dep. 39-40.)  Brookside would move the toilet facilities from field to field to accommodate the number of workers in a given field.  (G. Fritz Dep. 24.)  According to Lopez, Brookside placed two toilets in each field.  (Lopez Dep. 73.)  Lakeside rented portable toilets and placed three toilets with hand washing facilities in each field.  (Lopez Dep. 75-77; Dkt. No. 40, Ex. X.)

Leopoldo Tenorio testified that sometimes they brought bathrooms, and sometimes they did not.  (L. Tenorio Dep. 31-32.)  Hermelinda Tenorio does not recall which fields had toilets and which did not. She testified that on one occasion she went into a toilet and it was very dirty, so she decided not to look for toilets.  (H. Tenorio Dep. 103.)  Israel testified that sometimes there were no toilets so he would relieve himself at the edge of the field.  (I. Tenorio Dep. 151.)

Defendants relied on the crew leaders to provide drinking water for the workers. (G. Fritz Dep. 38-39; Jeff Groenhof Dep. 41.) While working for Brookside and for Lakeside Lopez would bring four full containers and put two containers out at a time. When they ran out, he would refill them. Sometimes he refilled the jugs two or three times in a day. (Lopez Dep. 79-83.) Lopez placed the water on the truck near where the workers were turning in their blueberries. (Lopez Dep. 79.) Lopez provided paper cone cups. (Lopez Dep. 84-85; Dkt. No. 40, Ex. J, H. Tenorio *Brady Farms* Dep. 126.) In his affidavit Leopoldo Tenorio stated that "many times there was no fresh water to drink." (L. Tenorio Aff. ¶ 26.) Yet, at his deposition he testified that he typically brought his own water, and he recalled only one occasion when he went to get water and there was no water and there were no cups. (L. Tenorio Dep. 31, 189-92, 225-26.)

There is no dispute that Defendants made arrangements to provide toilet, handwashing, drinking water, and cups. The issue raised by Plaintiffs' evidence is whether those arrangements were always sufficient. Proofs on the sufficiency of the sanitation facilities will necessarily vary from day to day and from field to field. The proofs do not suggest a general policy or standardized conduct of failing to provide sanitation facilities. Plaintiffs' experiences on any given day when they were working in 2003 would not resolve the issue of the sufficiency of sanitation facilities on another day, in another field, or in a different year.

Plaintiffs have failed to show the existence of an issue of standardized conduct or general policy that is common to all class members. Rather, it appears that given the variations in the conditions under which they worked, each individual will have to submit separate proofs to establish liability. The Court concludes that Plaintiffs have failed to meet the prerequisite of commonality.

## C. Typicality

The third requirement of Rule 23(a) is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This test limits the class claims to those "fairly encompassed by the named plaintiffs' claims." *Sprague*, 133 F.3d at 399 (quoting *In re Am. Med. Sys.*, 75 F.3d at 1082). This requirement is summarized by the phrase "'as goes the claim of the named plaintiff, so go the claims of the class.'" *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir.2000) (quoting *Sprague*, 133 F.3d at 399). "[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re Am. Med. Sys.*, 75 F.3d at 1082 (internal quotation marks omitted). Certification is improper if "[a] named plaintiff who proved his own claim would not necessarily have proved anybody else's claim." *Sprague*, 133 F.3d at 399.

Although the claims cover a six-year period, Plaintiffs worked for Defendants for only a fraction of the time period covered by this lawsuit, and they worked under only one

of Defendants' crew leaders.  The evidence reveals that the three named Plaintiffs worked for Brookside for approximately three months in 2003 and that Mr. and Mrs. Tenorio worked for Brookside for two days in 2004 and for Lakeside for only one day in 2004.  The only crew leader they worked under was Fidel Lopez.

Because Plaintiffs worked for a total of only three days for both Lakeside and Brookside in 2004, they have no knowledge as to Defendants' payroll practices or working conditions for the remainder of the 2004 season.  Plaintiffs did not work for either Defendant at any time in 2000, 2001, 2002, 2005, or 2006.  None of the Plaintiffs have any first hand knowledge of Defendants' payroll, posting, or sanitation practices in 2000, 2001, 2002, 2005, or 2006.  As noted above, the practices varied from Defendant to Defendant, from field to field, from crew leader to crew leader, and from day to day, even within a single season.  Those practices also evolved over the years.  It is difficult enough for Plaintiffs to show that their claims are typical of other workers in 2003 and 2004.  Given the variations in practices, it is impossible to say that Plaintiffs' experiences were typical of the experiences of class members in prior years or later years.

Plaintiffs' lack of typicality is also evident when it comes to their request for tolling of the applicable statutes of limitations.  In the Sixth Circuit equitable tolling depends on, among other things, lack of notice, lack of constructive knowledge of filing requirements, and diligence in pursuing one's rights.  *See Dunlap v. United States*, 250 F.3d 1001, 1008 (6th Cir. 2001).  Plaintiffs may not be proper proponents of tolling in light of their admitted

awareness of their legal rights and their participation in 2004 class-action against another blueberry farmer. (L. Tenorio Dep. 9-15, 33-34; *Galaviz-Zamora v. Brady Farms, Inc.*, 1:04-CV-661 (W.D. Mich.)).

Based upon this lack of typicality, even if Plaintiffs prove their own claims, they will not necessarily have proved anybody else's claim. The Court would have to take testimony from additional class members in order to compensate for this lack of typicality. As noted in *Sprague*, the need to take such testimony strongly suggests that class-wide relief is improper. 133 F.3d at 399. The Court concludes that the typicality requirement is not met.

**D. Adequacy of the Named Plaintiffs**

The fourth and final prerequisite of Rule 23(a) is the requirement that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Rule 23(a)(4) requirement is evaluated using two criteria: "'1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.'" *In re Am. Med. Sys.*, 75 F.3d at 1083 (quoting *Senter*, 532 F.2d at 525).

A class representative does not need to understand the legal details of the claim being asserted, but must be able to articulate, in a general sense, what wrong is alleged to have been committed by Defendants.

The Court has concerns about the adequacy of Plaintiffs as class representatives in light of their limited employment history with Defendants and several credibility issues that have surfaced in their affidavits, deposition testimony, and participation in the *Brady Farms* case. The Court also has some concerns about Plaintiffs' attorneys' overstatement of the facts of record. Nevertheless, the Court would not deny class certification on the basis of inadequacy of representation.

### E.  23(b) Requirements

Even if the Plaintiffs' proposed class meets the prerequisites of Rule 23(a), class certification would only be proper if, in addition to these prerequisites, one of the three alternative requirements in Rule 23(b) is met. Plaintiffs contend that certification is appropriate under the third requirement, which requires a finding

> that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b)(3).

The proposed class also fails the predominance and superiority requirements of Rule 23(b)(3). A class action will often offer substantial efficiency gains, particularly where the proposed class has a large number of members. However, in this case a class action would disintegrate into a series of mini-trials to sort out factual differences based on the defendant, the season, the week, the day, the field, and the crew. Minimum wage issues would depend on a determination of each individual's daily number of hours worked, the amount of

blueberries picked, and the amount of pay received.  Individual questions will likely predominate and any efficiency gained from class certification will be outweighed by the disadvantages of trying such a large number of individual questions of fact.  *See Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n.19 (5th Cir. 1996).  Here, the predominance of individual questions of fact, the absence of commonality, and the absence of typicality, render this case unmanageable as a class action.

**IV.**

For the foregoing reasons, Plaintiffs' motions for collective action certification and class action certification are denied.

An order consistent with this opinion will be entered.

Date:    December 14, 2007            /s/ Robert Holmes Bell
                                      ROBERT HOLMES BELL
                                      CHIEF UNITED STATES DISTRICT JUDGE